Chief Judge Desmond.
This is an article 78 proceeding brought by parents against the New York City Board of Education for a judgment annulling a determination of the board which, effective as of September, 1964, rezoned Public School No. 6 in Manhattan. The position of the petitioners — that the rezoning of this school was unreasonable, arbitrary and in excess of the discretionary powers of the Board of Education—is set forth in petitioners’ brief thus: “ To achieve a fixed racial quota at Public School 6 the respondents have prevented the children of the appellants from attending their neighborhood school and have refused to guarantee the continuity of their education, because of their race and color and therefore respondents have acted illegally in violating the constitutional and statutory rights of these children and of the appellants ’ ’. Special Term held that there were various sound reasons for the board’s action and that the conceded fact that such action was at least partially motivated by a desire to correct racial imbalance violated no rights of petitioners or any statutory or constitutional provision. The petition was, therefore, dismissed on the merits. The dismissal was affirmed by Appellate Division, First Department, in a Per Curiam opinion in which four Justices joined in saying: ‘' It is within the province of the board to conclude that racial' imbalance is harmful to education, and to draw school zones in order to effectuate a better racial balance in the school system ”, citing Matter of Balaban v. Rubin (14 N Y 2d 193, *403 cert. den. 379 U. S. 881) and Matter of Vetere v. Allen (21 A D 2d 561, affd. 15 N Y 2d 259). The Per Curiam noted that there exists neither a constitutional nor statutory mandate directing the board to promote integration nor any prohibition against such an attempt, that in this sphere the board’s freedom to act is untrammeled by the courts, and that, in the area of educational value judgments, the courts do not substitute their views for those of the board if there be some reasonable basis for the board’s conclusion.
The dissenting Justice at the Appellate Division expressed the view that a trial is necessary to determine the factual question arising from the assertion of petitioners that what the school board actually did was to redistrict so that the school would be underutilized and so that there would be an excuse then to fill up the school by bringing children thereto from other districts. The rationale of the dissent is found in these statements: “ That integration is desirable is not subject to dispute, but in all other respects the board is completely mistaken in its view. It has no right to bring in children from another district, whether they are of the same race as predominantly inhabits the area to which they are transported or not. Race has nothing to do with the question. Schools serve contiguous areas. School zones may not be changed to make the school available to children from noncontiguous areas.” The dissenting Justice concluded that all this violated section 3201 of the Education Law (also the public policy of Executive Law, § 296) which he read as setting up a right of a child “to be allowed to attend the school of his district and not to be excluded from a public school because of race, creed, color or national origin.” He stated, without citation of authority, that “ artificially bounded school districts are forbidden ” and that “ gerrymandering ” of districts to accomplish integration is illegal. The majority’s Per Curiam opinion, referring back to the dissent, stated that there was no pertinent factual issue to be tried.
The relevant facts as gleaned from the pleadings and from the other material presented to the Special Term are not disputed. Public School No. 6, with classes from kindergarten through the sixth grade, is in Manhattan on Madison Avenue between 81st and 82nd Streets. Until the new zoning was effected by the Board of Education the zone of Public School No. 6 included *404 120 square blocks with its northern boundary running along 94th Street to Park Avenue, then along 92nd Street to Third Avenue, then down to 63rd Street, and including much high-class residential property and a “ desirable ” elementary school. The new zoning adopted in 1964 by the board reduced the size of the zone to 71 square blocks. The new district is of the same contour as the old but the northern boundary streets are now 91st Street and 88th Street. The eastern boundary between 88th Street and between 79th and 68th Streets is changed from Third Avenue to Lexington Avenue. The western boundary is still Fifth Avenue. One result of the rezoning is that some 200 pupils who live in the school district as formerly bounded are now in other districts and must attend other schools. According to the petition the real purpose of changing the zoning was to create vacancies in School No. 6 so that pupils who do not now live, and have never lived, in School District No. 6 — that is, pupils now attending schools north of 96th Street, may be assigned to School No. 6. It is apparently the fact that practically none of the pupils formerly attending School No. 6 but living outside the newly bounded zone are Negroes or of Puerto Rican descent and that those brought in from schools north of 96th Street are almost all Negroes or Puerto Ricans.
As we know from other cases, the New York City Board of Education in May, 1964 adopted a policy of “Action Toward Quality Integrated Education ”, set forth in a pamphlet handed up to us on this appeal. Originally the board planned to pair this School No. 6 with School No. 198 but after discussions and controversy involving various groups a new plan was adopted, and put into effect, to make a new zone for Public School No. 6. The Board of Education determined that Public School No. 6 before rezoning was “overutilized” by 11%, that is, that it had an enrollment of 1,194 and a capacity of 1,073, that its average class size was between 33 and 34 pupils, and that the overcrowding produced a result that some of the first and third grade classes had to be given in “ overlap sessions ” resulting in a four-hour class day instead of a five-hour class day for these children. At that time the school enrollment was about 6% Negro and Puerto Rican. The new plan was completed and ordered on June 26, 1964, effective at the beginning of classes in September, 1964. By reducing the size of the zone the ~’¡er- *405 utilization was ended and space provided in Public School No. 6 for voluntary transfers from several overutilized schools outside the zone, not only to Public School No. 6 but to five other schools. It is estimated that this will reduce the average size of classes to about 31 pupils a class. All pupils at Public School No. 6 will now have regular full-time five-hour sessions. The percentage of Negroes and Puerto Ricans in Public School No. 6 will rise from about 6% to about 20%. The children on whose behalf this proceeding was brought were, under the new plan, transferred out of Public School No. 6 to other public schools slightly nearer to their homes by measurement than is Public School No. 6. Petitioners claim to be suing on behalf of about 200 children who will no longer be allowed to attend Public School No. 6, but it is alleged by the board, and apparently not denied, that all these children have been transferred out of Public School No. 6 to schools no farther from their homes than is Public School No. 6. The children from East Harlem schools transferred into Public School No. 6 under the new plan live considerable distances from Public School No. 6 and at least some of them are transported to Public School No. 6 by bus. Apparently the school authorities, to get the consent of these new children to transfer into Public School No. 6, promised them that they will be allowed to remain at Public School No. 6 until they complete the highest grade. All the children who formerly attended Public School No. 6 and who have been rezoned out of that school are white.
We agree with the courts below that here, as in Matter of Balaban v. Rubin (14 N Y 2d 193, supra) and Matter of Vetere v. Allen (21 A D 2d 561, affd. 15 N Y 2d 259, supra), the courts are without power to invalidate the plan on such grounds. The arguments of appellants and the position taken in the Appellate Division dissent have been rejected by us in those previous cases.
The order should be aErmed, without costs.